# Commissioners of the Rouse Estate, Appellants, *v.* Directors of the Poor of McKean County Poor District.

*Poor Laws—Settlement—Petition and answer—Citizenship.*

In a proceeding by one poor district against another to recover money expended in the care of a pauper, where the petition states that the pauper's wife was possessed of an estate in fee simple in the respondent poor district, and that the husband resided thereon with his family, and thereby gained a settlement in said district, it is obvious that the petitioners mean that the settlement was gained because the pauper was a tenant by the curtesy initiate of his wife's land, or that he had a statutory interest under the act of 1855, and it is in substance an averment of citizenship. If he had no such estate because of alienage, it was incumbent upon the respondents to so aver in their answer; and if they do not do so, the court is warranted in assuming the pauper's citizenship without passing upon the question as to whether, as a general rule, it will be presumed or must be made affirmatively to appear.

*Poor laws—Jurisdiction of court of quarter sessions—Act of 1893.*

In such case the court of quarter sessions of the county wherein the last legal settlement is alleged to be has jurisdiction to adjudicate the dispute.

The act of June 8, 1893, P. L. 345, which provides "that the several courts of common pleas within their several counties have the power to issue writs of mandamus to all officers and magistrates elected or appointed within their respective counties," does not take from the court of quarter sessions the power to make or enforce orders under the poor laws, plainly conferred upon it by the 23d section of the act of 1833.

*Estate by the curtesy—Statutes of 1848, 1850, 1855, 1863 and 1867.*

An estate by the curtesy has not been annihilated by the statutes of April 11, 1848, P. L. 536, sec.10; April 22, 1850, P. L. 553, sec. 20; May 4, 1855, P. L. 430; April 1, 1863, P. L. 212, and April 3, 1887, P. L. 332, nor by the decisions interpreting them; but it still exists as a freehold estate in the husband, incapable of divestiture during the wife's life, except by joint deed of the husband and the wife.

*Mandamus—Order.*

Where the facts set out in the complaint show that the petitioners used the word mandamus in its ordinary signification; that they prayed the court to command or order the poor district to pay the bill, it is unimportant that the word mandamus is used instead of order.

Argued May 2, 1894. Appeal, No. 448, Jan. T., 1894, by plaintiffs, from decree of Q. S. McKean Co., October Term, 1893, No. 69, discharging rule for mandamus. Before STER-RETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ. Decree reversed.

Petition of the Commissioners of the Rouse Estate who are invested with the duties and functions of overseers of the poor of Warren county, praying the court to grant a rule upon the Directors of the Poor of McKean County Poor District to show cause why a mandamus should not issue to compel them to pay certain moneys expended by petitioners in the case of Milo D. Wheeler, a pauper.

The facts appear in the opinion of the Supreme Court.

The court, MORRISON, J., discharged the rule for mandamus at the cost of petitioners. Petitioners appealed.

*Error assigned* was above order.

*W. W. Wilbur*, of the firm of *Wilbur & Schnur*, for appellants: —The issue as made up by the record is only as to the facts stated in the plaintiffs' petition, and alienage is not one of these facts, and as the respondents do not set up alienage as a defense in their answer, that question is not in the case.

Aliens may purchase and hold real estate not exceeding in quantity 5000 acres, and an alien can take lands by devise or descent. Act of Feb. 23, 1791, Purdon's Digest, 84, section 1; Sharswood & Budd's Leading Cases in the American Law of Real Property, volume 1, page 521. Tenancy by the curtesy initiate is a freehold interest during the life of the wife : Clarke's App., 79 Pa. 376; Woodward v. Wilson, 68 Pa. 208; Gourley v. Kinley, 66 Pa. 271. The act of June 3, 1887, did not change the legal unity of husband and wife or destroy the estate of tenancy by curtesy: Bramberry's Est., 156 Pa. 633; Teacle's Est., 132 Pa. 533. The wife's property is the husband's in contemplation of the law of settlement: Bank v. Stauffer, 10 Pa. 399; Burrell Township v. Pittsburg Guard. of Poor, 62 Pa. 472.

One having a legal settlement here who removes to another state, but without obtaining a settlement there returns to another district in this state, is chargeable to the first district where he was formerly settled : Poor District v. Poor District, 1 Lanc. 347; Brightly's Digest, 4570, sec. 2, not reported; Overseers of Parker City v. Overseers of DuBois, 20 W. N. C. 81; Juniata Co. v. Overseers, 107 Pa. 68; Plumb Creek Township v. Elderdon Borough, 129 Pa. 626.

*T. F. Richmond*, for appellees.—There is no assertion of citizenship in plaintiffs' petition, and the court cannot presume the existence of the fact. The petition must set forth the facts: Act of 1893, P. L. 345.

An alien acquires no title to his wife's estate of inheritance, as tenant by the curtesy initiate: Reese v. Waters, 4 W. & S. 145; Sharswood & Budd's Leading Cases in the American Law of Real Property, volume 1, p. 275; act of May 1, 1861, P. L. 433.

The act of May 4, 1855, treats the interest by the curtesy as arising at the period of the wife's death, and places it upon the same level as a right under the intestate laws in her personal property: Endlich & Richard's Rights and Liabilities of Married Women in Pennsylvania, page 67; Moninger v. Ritner, 104 Pa. 298–302.

Even if this were not so, the mandamus prayed for could not legally issue: Act of June 8, 1893, P. L. 345; High's Ext. Leg. Rem. p. 240, sec. 339; Commonwealth v. Commissioners of Allegheny, 16 S. & R. 317; Commonwealth v. Clark et al., 6 Phila. 498; High's Ext. Leg. Rem. p. 241, sec. 339; Commonwealth v. Commissioners of Allegheny, supra.

When the legal right has not been ascertained, or a remedy exists sufficient to enforce the right claimed, the writ of mandamus will not be granted: Overseers of Porter v. Overseers of Jersey Shore, 82 Pa. 279; Commonwealth v. Rossetter, 2 Binn. 360; Commonwealth v. Mitchell, 2 P. & W. 517; Hester's Case, 2 W. & S. 416; Reading v. Commonwealth, 11 Pa. 196; James v. Bucks County, 13 Pa. 72; Heffner v. Commonwealth, 28 Pa. 108; Borough of Little Meadows, 28 Pa. 256; Troubat and Haley's Practice, vol. 1, p. 282, sec. 513.

Does the complaint set forth sufficient facts to establish the liability of McKean County Poor District and warrant of quarter sessions in making such an order? Marion Twp. v. Spring Twp., 50. Pa. 308; Cowanshannock Twp. v. Valley Twp., 152 Pa. 506; Sugarloaf v. Schuylkill County, 44 Pa. 483.

The proceeding was in mandamus, and plaintiffs were not entitled to an appeal: Act of June 14, 1836, sec. 32, P. L. 626; act of May 25, 1881, P. L. 32; act of June 24, 1885, P. L. 151; act of June 8, 1893, P. L. 349; Commonwealth v. Lackawanna County, 133 Pa. 180.

OPINION BY MR. JUSTICE DEAN, July 18, 1895:

The county commissioners of Warren county, by virtue of their office, are commissioners of the Rouse estate, who have cast upon them, by special acts of assembly of April 8, 1864, and April 4, 1866, all the duties and functions of overseers of the poor for the county of Warren.

On October 2, 1893, the commissioners presented their petition to the court of quarter sessions of McKean county, averring:

1. That on 7th of January, 1890, one Milo D. Wheeler became an inhabitant of McKean County Poor District, and with his wife and family, resided in Corydon township, from January 7th, 1890, to January 19th, 1892. That his wife was the owner in fee simple of a tract of land in said township, containing seven and one half acres, from January 7th, 1890, until January 20th, 1892, at which time Harriet Travers purchased it from her. That during his wife's ownership, the family lived upon this land.

2. That on 20th January, 1892, Wheeler went to Jamestown, New York, where he remained about thirty days, and then came back to Pennsylvania and went to work in Warren county.

3. That by the laws of New York, one year's residence is required to gain a settlement in said state, and therefore his settlement continued to be in McKean County Poor District.

4. That on 5th of April, 1892, about sixty days after his return from New York, while working in Kinzua township, Warren county, he was assaulted and stabbed, whereby he became sick and disabled, and a charge upon the Commissioners of the Rouse Estate, who in caring for and maintaining him, had laid out and expended $108.50.

5. That on demand being made of McKean County Poor District for payment of the sum so expended, payment was refused.

They prayed for a mandamus upon the Directors of the Poor of McKean District. To this, the Poor Directors of McKean made answer:

1. That, the occupancy of property in McKean county by Wheeler, as averred, was not sufficient to give him a settlement in that Poor District.

2. That Wheeler's removal to New York with his family, was with the intention of relinquishing his residence in Pennsylvania, and adopting New York as his future residence; that his return to Pennsylvania was only for a temporary purpose.

3. That the bill demanded was excessive.

No evidence was taken by either party, and the case was heard on the issue made up by petition and answer.  The court below, and the counsel, assumed the averment of facts in the petition to be true.  The legal conclusions from them, alone, are in controversy.

The first question raised in argument, is, that it nowhere affirmatively appears, that Wheeler is an American citizen, and as an alien, by the law of Pennsylvania, he can acquire no legal residence by living with his wife upon her land.

On this point, we think the facts, and conclusions from the facts averred in the petition sufficiently set out the political status of the pauper.  The petition states, his wife was possessed of an estate in fee simple in seven and one half acres of land; that the husband resided thereon with her and his family, and thereby gained a settlement in McKean County Poor District.  Why?  Obviously, because he was a tenant by the curtesy initiate of his wife's land, or had a statutory interest under act of 4th May, 1855.  If he had no such estate or right because of alienage, it was incumbent on respondents to so aver in their answer.  Instead of denying this necessary conclusion from the facts of the petition, respondents content themselves with, in effect, denying that a tenancy by the curtesy initiate is sufficient in law to constitute a settlement.  There was, therefore, in substance, an averment of citizenship in the petition, and no denial of it in the answer.  As respondents practically assumed the pauper's citizenship in the pleadings, we are warranted in doing so now, without passing on the question as to whether, as a general rule, citizenship in like cases will be presumed or must be made affirmatively to appear.

The next question raised, is as to the existence of any estate or interest in the husband during the time a freehold estate was vested in the wife.  The deed for the land was delivered to the wife, January 7, 1890, and she conveyed it to Harriet Travers January 20, 1892.  Before the conveyance to Mrs. Wheeler the act of 3d June, 1887, was passed, enacting that every mar-

ried woman should have the right to hold, possess, control and dispose of her property as if she were feme sole, and that it should belong to her, and not to her husband, providing, however, that she should have no power to mortgage or convey her real estate, unless joined by her husband. So the law stood until the passage of the act of June 8, 1893, the 5th section of which contained the proviso, that nothing in this act shall affect the husband's right as tenant by the curtesy.

Assuming for the present that before the act of 1887, under the act of 1848, the husband's tenancy by the curtesy had not been stricken down, then, was it destroyed by the later act? It was denied in Teacle's Estate, 132 Pa. 533, that the act of 1887 had that effect. In that case, we held, interpreting the 5th section of the act, which is much broader in phraseology than the 1st section, that the husband's estate as survivor was not affected, this court says:—"It is contended by appellants, that this section enables a married woman to dispose of her entire estate by will, wholly ignoring any interest of her husband therein, including his right of tenancy by curtesy. . . . It does not enable her to disinherit her husband." To the same effect is Bramberry's Estate, 156 Pa. 628. Our brother Mc-Collum, in discussing the effect of the act of 1887 on estates created by the unity of person resulting from the marriage relation, says:—"The act of 1887 was intended to protect the property of the wife from the dominion and control of the husband, but not to change the nature of her estate, or destroy the legal unity of person which characterizes their relations to each other."

While it is difficult, since the legislation of the last fifty years for the protection of married women's estates, to fix with certainty the extent of the husband's estate in his wife's land, the fact of such estate vesting in him by virtue of the marital relation has never been denied, either by statute or by the courts. At common law, on birth of a child, the father had a permanent interest in his wife's land, and was called tenant by the curtesy initiate. He could, to some extent, charge the wife's lands, but his tenancy was consummate only on the death of his wife: 2 Bl. Com. 127. The interest of the husband in the land was as absolute, however, as the ownership of her chattels, and the husband's creditors could appropriate his estate in pay-

ment of their debts.   By the act of 1833, tenancy by the cur-
tesy became initiate by the marriage; the birth of issue was no
longer a constituent in the creation of the estate.   Then, by act
of 1848, it was enacted, that the property of a married woman
should be as fully hers after marriage as before, and should not
be subject to the debts or liabilities of the husband.   Under this
act, it was held, that, by it, both her property and possession
were protected, and that a purchaser at sheriff's sale of the hus-
band's interest could not sustain ejectment against even the
husband.   Then followed the act of 22d of April, 1850, which
enacted, that the husband's estate by the curtesy should be
exempt from even levy and sale during the life of the wife.
But notwithstanding this act, it was held in Harris v. Insurance
Co., 50 Pa. 341, that as tenant by the curtesy, he might effect
a valid insurance on the buildings on his wife's land.   It was
argued in this case, that the husband's estate by the curtesy no
longer existed in this state; that by legislation it had been de-
stroyed, and turned into a mere expectancy depending on the
husband surviving the wife.   But it was held, the husband had
an insurable interest, notwithstanding the act of 1850, which
protected it from execution during the wife's life; the court
saying :—" His interest exists still, and is none the less vital
because protected during his wife's life."   The act of 1850 was
followed by that of 4th May, 1855, which enacted, that a mar-
ried woman's power to dispose of her property by will, as
against her husband, should be restricted the same as the hus-
band's power is restricted as against the wife, and that any sur-
viving husband might elect to take such share in his wife's
estate, as she could, surviving him, elect to take against his
will, or he might otherwise take as tenant by the curtesy.
While this act enlarged his privileges, it can hardly be said to
have enlarged his estate; but it certainly did not cut down the
estate to less than had been decided to be his, in Harris v. Ins.
Co., supra, under the act of 1850.   This was followed by act
of April 1, 1863, which declared the true intent and meaning
of the act of 1848 and supplements thereto, to be :—" that no
judgment obtained against the husband of any married woman,
before or during marriage, shall bind or be a lien upon her real
estate, or upon any interest the husband may be entitled to
therein, as tenant by the curtesy."   The next legislation on the

subject was the act of 1887, already noticed, and this court again, in Teacle's Estate, and Bramberry's Estate, supra, held, notwithstanding the sweeping language of the statute, that by virtue of the marital relation, there still vested in the husband an estate in his wife's land.   The argument, that estates by the curtesy were practically destroyed, or at least suspended during the life of the wife, by operation of the acts of 1848, 1850, 1855 and 1863, is conclusively answered by the opinion of the court, AGNEW, J., in Clarke's Appeal, 79 Pa. 376, where the whole question is fully discussed, and the conclusion in Harrison v. Ins. Co., supra, as to the effect of exempting the husband's interest from seizure during the life of the wife, is adopted; in the language of that opinion:—" The upshot is a mere stay of execution, not an annihilation of an estate."   Further, as to the act of 1855, it was pertinently said, the whole effect was to give the husband an alternative election to take the same estate the law would give him as against her will, or take his earlier estate by the curtesy in the whole of her real estate.  ·

So that it is settled, that neither by these statutes, nor by decisions interpreting them, has the existence of an estate by the curtesy been annihilated; the nature of the estate, whatever now may be its value, is the same as declared by GIBSON, C. J., in Bank v. Stauffer, 10 Pa. 398;—" The husband indeed becomes seized of a freehold by the marriage, but it is the wife's freehold, not his, insomuch that both must do homage for it. . . . . But after issue born, he has a freehold in his own right . . . . and the wife cannot forfeit it for treason. . . . He is then said to be tenant by the curtesy initiate, though the new character of the interest is not consummated by anything less than his wife's death.   As then the defendant had an independent estate in his wife's land, which might have been aliened by his separate act, it was bound as an inchoate one by the judgment against him for his separate debt.   Were it necessary to decide whether our statute, which dispenses with the birth of issue as a constituent of curtesy consummate, does not dispense with it also as a constituent of curtesy initiate, there would be little difficulty in maintaining that it does."

Starting, then, with this decision, as late as 1849, which maintains the integrity of the common law estate by the curtesy, and noting the steps of the legislature and the courts in dealing

with it, down to the act of 1893, which expressly preserves it, we conclude, that, though the legislative ax has lopped off some of the prominent branches, it has not cut down the tree; the mutilated trunk still stands. The estate is no longer independent of the wife's; the husband, by his separate act, cannot alien it; it cannot be bound by the lien of a judgment for his separate debt; cannot be seized on execution by his creditor; nevertheless, it still exists as a freehold estate in the husband, incapable of divestiture during the wife's life, except by their joint deed. When the unity of person is ended by the wife's death, then the estate becomes consummate in the husband, only because his control of it is no longer hampered by provisions necessary to the wife's enjoyment of her estate.

Nor does the estate, as argued by appellee, stand upon the same plane as the wife's inchoate right of dower; the husband, in a degree, has the present enjoyment of the initiate estate during the life of the wife, which she cannot divest by her deed or mortgage; either, if not joined in by the husband, is an absolute nullity; so that, by no deed of her estate, or mortgage pledge thereof, can she defeat his during her life, or peril his possession. On the other hand, his deed to a purchaser of his own land will support ejectment, and dispossess both during his life; his mortgage sued out to judgment and sale, will divest her dower, so as to bar any claim by her after his death. Hence, the right of dower and estate by the curtesy are not of the same nature, and are clearly not of the same value.

We are therefore of the opinion, that by the terms of the act of 1836, which declares that a settlement may be gained in any poor district: "By any person who shall become seized of any freehold estate within such district, and shall dwell upon the same for one whole year," Wheeler gained a settlement in the Poor District of McKean County; and as he gained none in New York or elsewhere, after he left McKean county, January 20, 1892, his last legal settlement was the Poor District of that county; consequently, the burden of his support legally falls upon that district.

As to the objection of appellee, that the court of quarter sessions of McKean county is without jurisdiction in the case preferred in the petition, we think, under the 23d section of act of 1833, the jurisdiction is clearly conferred upon that court.

It directs, that:—"If any person shall come out of any . . . . district in this commonwealth into any other district, and shall happen to fall sick . . . . before he shall have gained a settlement therein, so that he cannot be removed, the overseers of such district shall give notice as soon as conveniently may be . . . . to the overseers of the district where such person had last gained a settlement . . . . and if they shall neglect or refuse to pay the moneys expended for the use of such poor person and take order for relieving and maintaining him . . . . in every such case it shall be the duty of the quarter sessions where such poor person was last settled, upon complaint to them made, to compel payment by such . . . . overseers of all such sums of money as were necessarily expended for such purpose in the manner directed by law in the case of a judgment against overseers."

The provisions of this section are applicable to the facts in this case. It was the duty of Warren county, in the exigency, to render immediate relief, and then ascertain and fix liability for the expenditure on the district of the poor person's last legal settlement. And the court of quarter sessions of the county wherein was the alleged last legal settlement had jurisdiction to adjudicate the dispute. And according to the almost uniform practice for many years, the quarter sessions has adjudged such cases. As is said by WOODWARD, J., in delivering the opinion of this court, Nippenose Township v. the Borough of Jersey Shore, 48 Pa. 402:—"Common law actions in pauper cases ought not to be favored . . . . The theory of the poor law is, that the quarter sessions are to administer it. It was intended to be a system, which, with the aid of that court, should execute itself, and work out its own results, without calling in the aid of the common law."

The contention of appellee's counsel, that the act of June 8, 1893, which provides, "That the several courts of common pleas shall, within their respective counties, have the power to issue writs of mandamus to all officers and magistrates elected or appointed within their respective counties," takes from the quarter sessions the power to issue orders under the poor laws, cannot be sustained. It neither expressly nor by implication repeals the jurisdiction so plainly conferred upon the quarter sessions by the 23d section of the act of 1833, to make

an order upon respondents, and enforce the same. That the petitioners pray for a mandamus instead of an order, as named in the act, is unimportant; both are commands, and although, by long legal use the word mandamus has acquired a technical signification, restricted to those cases only where there is no other remedy, the facts set out in the complaint show, that the petitioners used the word in its ordinary signification ; that is, they prayed the court to command or order the Poor District of McKean county to pay the bill.

The decree of the court below discharging the rule is reversed, and it is now ordered and decreed, that the Directors of the Poor of McKean County Poor District, respondents, pay to the Commissioners of the Rouse Estate, plaintiffs, the sum of one hundred and eight dollars and fifty cents ; it is further ordered, that appellees pay the costs in the court below and on this appeal.